UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CORY WAGNER,

                    *Plaintiff,*

v.                                       No. 19-cv-4

ALEX HYRA, New York State Police
Officer; and THOMAS JUDGE,
New York State Police Officer;

                  *Defendants.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:               OF COUNSEL:

OFFICE OF LEE GREENSTEIN     LEE GREENSTEIN, ESQ.
*Attorneys for Plaintiff*
125 Adams Street
Delmar, NY 12054

HON. LETITIA JAMES          RYAN W. HICKEY, ESQ.
Attorney General for the       Ass't Attorney General
   State of New York
*Attorneys for Defendants*
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

    Plaintiff Cory Wagner ("Wagner" or "plaintiff"), a former deputy with the

Rensselaer County Sheriff's Office (the "Sheriff's Office"), brings this civil

rights action against State Police Investigators Alex Hyra ("Hyra") and Thomas Judge ("Judge" and, together with Hyra, "defendants"). Following this Court's February 10, 2021 motion to dismiss order, plaintiff's claims for false arrest, false imprisonment, abuse of process, malicious prosecution, violation of his right to privacy, and failure to intervene remain. Both parties have now moved for summary judgment, the motions have been fully briefed, and on February 9, 2023, the Court heard oral argument. The Court will now consider the motions on the basis of the parties' submissions and oral arguments.

## II. BACKGROUND

In September 2017, New York State Police received a report that a twenty-two-year-old male, Jacob Empie ("Empie"), had engaged in a sexual relationship with an 11-year-old girl. Dkt. 56-3, Plaintiff's Statement of Material Facts ("PSMF") ¶¶ 5, 22. Later that month, defendants Hyra and Judge, investigators for the New York State Police, interviewed Empie at his Vermont residence regarding this allegation. *Id.* ¶ 22. During this interview, Empie disclosed that when he was 7 years old and living in New York, he had been sexually assaulted by an 11-year-old child. *Id.* ¶ 23. Later in the investigation, Empie would identify Wagner as the child who had molested him fifteen years prior. Dkt. 64-3, Defendants' Statement of Material Facts ("DSMF") ¶¶ 6-7.

Hyra knew Wagner prior to defendants' September 2017 investigation of Empie because plaintiff had worked for the Hoosick Falls Police Department. PSMF ¶ 6; Dkt. 62-1, Defendants' Response to Statement of Material Facts ("DRSMF") ¶ 6.  Hyra also had a friendship dating back to 2012 with Kevin Rose ("Rose"), a dispatcher with the Sheriff's Office who had been involved in a past incident with plaintiff.  PSMF ¶¶ 7-9.  Specifically, in 2016, plaintiff's girlfriend accused Rose of "keying" her vehicle, which resulted in a police investigation.  *Id.* ¶ 10.  Rose testified that he received a call from Hyra (as a friend, not in Hyra's capacity as a State Trooper) during which Hyra advised him about the accusations and resulting investigation.  *Id.* ¶ 11.  According to Rose, following the vehicle keying incident, plaintiff and Hyra became like "oil and water" because plaintiff's accusations "really pissed [Hyra] off."  *Id.* ¶ 12.  Relatedly, Rose explained that, prior to plaintiff's arrest on the Empie case, Hyra had mentioned his dislike for plaintiff during "many conversations" and professed that "karma's gonna get [plaintiff]" for having his girlfriend file the complaint against Rose.  *Id.* ¶ 13-14.

On October 17, 2017, Hyra again interviewed Empie, who detailed how a child named "Cory" had forced Empie to perform sexual acts on him under threat of physical harm.  PSMF ¶¶ 25-26.  Following this interview, on October 27, 2017, Hyra again met with Empie and showed him a yearbook from Empie's elementary school.  *Id.* ¶¶ 31-32.  From the yearbook photos,

Empie identified Wagner as the individual who had sexually assaulted him in 2002. DSMF ¶¶ 6-7. On November 3, 2017, law enforcement interviewed Empie again, who requested plaintiff be arrested and prosecuted. *Id.* ¶ 11.

With respect to the Wagner investigation, both Judge and Senior Investigator John Ogden, defendants' supervisor at the time, acknowledged that investigators determine the issue of jurisdiction prior to making an arrest. Dkt. 56-6 (Judge Dep.) at 100:12-22; Dkt. 56-16 (Ogden Dep.) at 27:13-28:9. Relatedly, Ogden testified that he contacted Kelly Cramer, Assistant County Attorney at the Rensselaer County Attorney's Office, to discuss the investigation. DSMF ¶ 18. According to Ogden, Cramer noted that Wagner's age may pose issues in Family Court, but that it should not preclude the police from moving forward with their investigation. *Id.* ¶ 18. Cramer, however, testified that she "does not specifically recall her conversation with Ogden," but guessed "that it was 'very possible' that she 'conferenced' this case with the State Police." PSMF ¶ 94. At the same time, however, Cramer stated that she does not advise officers to make arrests. Dkt. 56-23 (Cramer Dep.) at 23:5-14.

On November 6, 2017, Judge called Wagner and instructed him to come to the State Police Barracks in Brunswick, New York. PSMF ¶ 50. At the time, plaintiff, a recently hired Rensselaer County Deputy Sheriff, was not aware of the purpose of this interview. Dkt. 56-15 (Wagner Dep.) at 13:15-20; *id.* at

16:7-17:16.  When plaintiff arrived at the barracks, a state trooper brought him to an interview room, questioned him about Empie's sexual assault allegations, and provided *Miranda* warnings.  *Id*. at 19:9-27:7.  Plaintiff denied the allegations, requested an attorney, and the interview ended.  *Id*. at 27:8-11.  Following the interview, defendants placed plaintiff under arrest.  PSMF ¶¶ 52, 56.  Prior to the arrest, Ogden contacted the Sheriff's Office, where plaintiff had recently begun working, and two officials from the Sheriff's Office were present when plaintiff was arrested.  *Id*. ¶ 58.  The Sheriff's Office officials informed plaintiff that, due to his arrest, he was terminated from his employment.  *Id.*

Hyra issued Wagner a family court appearance ticket (the "Appearance Ticket") charging him with first degree sodomy in violation of Penal Law ("PL") § 130.50.  PSMF ¶ 59; Dkt. 56-18 (App. Ticket).  Although Hyra ultimately issued the Appearance Ticket, he relied on Judge, who was more senior, for his experience and insight leading up to the arrest. *See* Judge Dep. at 54:1-55:4.

In 2017, the statutes relevant to Wagner's charges were as follows: Family Court Act ("FCA") § 301.2 defined "Juvenile Delinquent" as:

> [A] person over seven and less than sixteen years of age, who, having committed an act that would constitute a crime if committed by an adult, (a) is not criminally responsible for such conduct by reason of infancy, or (b) is the defendant in an action ordered removed from a criminal court to the family court…

PL § 30.00(1) provided that:

> no person under the age of 16 could be found criminally responsible for conduct," except as provided in PL § 30.00(2), which stated that "[a] person thirteen, fourteen or fifteen years of age is criminally responsible for acts constituting … subdivisions one and two of PL § 130.50 (criminal sexual act in the first degree) …

FCA § 302.2 outlined the statute of limitations for a juvenile delinquency proceeding, stating that:

> A juvenile delinquency proceeding must be commenced within the period of limitation prescribed in § 30.10 of the Criminal Procedure law or, unless the alleged act is a designated felony as defined in subdivision eight of § 301.2, commenced before the respondent's eighteenth birthday, whichever occurs earlier.  When the alleged act constitutes a designated felony as defined in subdivision eight of § 301.2 such proceeding must be commenced within such period of limitation or before the respondent's twentieth birthday, whichever occurs earlier.

FCA § 301.2(8) defined a "designated felony act" as:

> [A]n act which, if done by an adult, would be a crime: (i) defined in … 130.50 (criminal sexual act in the first degree).

And, finally, FCA § 381.3(1) provides that:

> All police records relating to the arrest and disposition of any person under this article shall be kept in files separate and apart from the arrests of adults and shall be withheld from public inspection.

The Appearance Ticket was predicated on Wagner's alleged sexual assault of Empie from June–September 2002.  PSMF ¶ 59; App. Ticket.  At the time of the alleged sexual assault, plaintiff was 11, and Empie was seven.  *Id*. ¶¶ 25, 59.  In November 2017, at the time plaintiff received the appearance

ticket, he was 27. *Id.* ¶ 63. Printed in the top right corner of the Appearance

Ticket were the words "Juvenile Delinquency," with a signature line directly

below to write in the name of the "PARENT/PERSON LEGALLY

RESPONSIBLE FOR THE CHILD'S CARE," where Hyra filled in "N/A."

App. Ticket. Prior to this incident, Hyra had never written a Family Court

ticket. PSMF ¶ 66.

The night of Wagner's arrest, Hyra called Rose and told him about it,

including that he charged plaintiff with Sodomy First Degree. PSMF ¶ 17.

Hyra noted that the arrest was "hush hush." *Id.* During the conversation,

Hyra also told Rose that the arrest "involved a male when he was younger

that had accused [plaintiff] of sexually assaulting him." *Id.* ¶ 18. Hyra

stated that "he wished he could have told" Rose prior to the arrest, but could

not because the troopers at his barracks "didn't want it to get out." *Id.* ¶ 19.

The day after Wagner's arrest, his arrest information appeared on the

State Police online blotter, which is available publicly, PSMF ¶¶ 69-71. This

occurred despite FCA § 381.3(1)'s directive that juvenile offenses must

remain confidential. FCA § 381.3(1). Citing testimony from Mark Cepiel

("Cepiel"), the State Police Information Officer, defendants claim that

plaintiff's arrest was published on the blotter due to a computer error out of

their control. DSMF ¶¶ 20-22; Dkt. 57-13 (Cepiel Dep.) at 11:22-13:3; *id.* at

19:12-20:9.[1]  However, Cepiel did not know for certain if there was a computer error; he suggested it as a possibility, but ultimately stated that he "[did not] have any explanation" for how plaintiff's arrest made it onto the police blotter.  Cepiel Dep. at 17:12-17.  After plaintiff's arrest appeared on the blotter, a news source contacted Cepiel to inquire about it.  PSMF ¶ 71. Cepiel then looked in the computer system, noticed that the arrest was marked juvenile and thus should not have appeared on the blotter, and took steps to have it taken down.  *Id*.

On December 7, 2017, and December 21, 2017, Cramer wrote letters to Wagner's counsel and Hyra advising them that her office was declining to prosecute plaintiff.  PSMF ¶ 73.  The letters explained that because Family Court provides services to juveniles, is not punitive in nature, and plaintiff was 27 years old, there were "no dispositional options [that could] be ordered."  *Id*.

Following the resolution of his criminal matter, Wagner brought the instant action.  *See generally* Dkt. 12.  At this stage, plaintiff's claims for false arrest, false imprisonment, abuse of process, malicious prosecution, violation of his right to privacy, and failure to intervene remain.  Both sides have now

---

[1] Cepiel also acknowledged that officers enter the arrest information into the police blotter, and it is their responsibility to indicate if an arrest involves a juvenile.  Cepiel Dep. at 10:3-12:9.  Hyra, who claims he personally submitted the arrest into the system, testified that he in fact did include the juvenile distinction.  Hyra Dep. at 111:4-15.

moved for summary judgment, and on February 9, 2023, the Court heard argument on the parties' respective motions.

## III.  <u>LEGAL STANDARD</u>

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).  However, the "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 252.

Where, as here, the parties have cross-moved for summary judgment, a reviewing court "must evaluate each party's motion on its own merits, taking

care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Smith v. NYS Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90, 95 (N.D.N.Y. 2021) (citation omitted).  In undertaking this analysis, it bears noting that "a district court is not required to grant judgment as a matter of law for one side or the other." *Id*.

## IV.  **DISCUSSION**

At this stage of the action, several of Wagner's claims for relief under 42 U.S.C. § 1983 remain: false arrest (Count I), false imprisonment (Count V), abuse of process (Count VII), malicious prosecution (Count III), failure to intervene (Count IX), and violation of his right to privacy (Count VI). Defendants move for summary judgment on each of these claims, and plaintiff moves for summary judgment on his false arrest, false imprisonment, failure to intervene, and privacy claims.  The Court will address each in turn.

### A. **False Arrest, False Imprisonment, and Malicious Prosecution Against Hyra and Judge (Counts I, III, and V)**

Wagner first argues that he is entitled to summary judgment on the false arrest and false imprisonment claims because no reasonable officer could have concluded that he could be prosecuted in family court as a 27-year-old, or that there was probable cause to believe he had committed a crime.

Defendants argue that these claims, as well as the malicious prosecution claim, fail as a matter of law because the facts demonstrate probable cause for their arrest of plaintiff.

A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). And under New York law, false arrest and false imprisonment are "one and the same." *Morales v. United States*, 2023 WL 2129580, at *4 (E.D.N.Y. Feb. 17, 2023) (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)). To establish a cause of action for false arrest, a plaintiff must show that: (1) the defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Id.* (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)).

To establish a claim for malicious prosecution, a plaintiff must show: (1) that the defendant initiated a prosecution against the plaintiff; (2) that the defendant lacked probable cause to believe the proceeding could succeed; (3) that the defendant acted with malice; and (4) that the prosecution was terminated in the plaintiff's favor. *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("*Posr II*") (citation omitted).

For each of these claims, the parties' dispute boils down to whether Wagner's arrest was based on probable cause.[2]   For the false arrest and false imprisonment claims, this implicates the fourth element, because an arrest is privileged when it is based on probable cause. *See Jenkins*, 478 F.3d at 84. For the malicious prosecution claim, it implicates the second element, which requires a plaintiff to show that the defendant lacked probable cause. *See Posr II*, 180 F.3d at 417.

Stated another way, the existence of probable cause is a complete defense to claims of false arrest, false imprisonment, and malicious prosecution. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).  An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).  In the context of malicious prosecution, "probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the

---

[2] Defendants make nearly identical arguments in support of their assertion that they are entitled to qualified immunity on these claims, as well as on plaintiff's abuse of process claim. Understandably so, because if defendants had probable cause to arrest plaintiff, they would likely be entitled to qualified immunity on these claims.  As noted *infra*, however, the Court finds that defendants lacked probable cause as a matter of law.  Accordingly, defendants' qualified immunity arguments will be rejected as to the false arrest, false imprisonment, malicious prosecution, and abuse of process claims.  Defendants also assert that they are entitled to qualified immunity as to plaintiff's right to privacy claim, which the Court addresses in § IV.D.

defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994).

Courts look to the "totality of the circumstances" in determining whether probable cause exists, *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989), and must consider "those facts *available to the officer* at the time of the arrest and immediately before it," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers …" *Coleman v. City of New York*, 585 F. App'x 787, 789 (2d Cir. 2014) (summary order) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Upon review, no rational juror could find that defendants had probable cause to arrest or prosecute Wagner. The Court will grant plaintiff's motion for summary judgment on his false arrest and false imprisonment claims, and deny defendants' motions for summary judgment on plaintiff's false arrest, false imprisonment, and malicious prosecution claims.[3, 4]

---

[3] Defendants do not dispute that plaintiff has established the other elements of a false arrest and/or false imprisonment claim, and the undisputed facts plaintiff presents are sufficient to support his entitlement to summary judgment on these counts.

[4] Although the Court holds that defendants lacked probable cause as a matter of law, plaintiff has not moved for summary judgment on his malicious prosecution claim, and it remains for trial.

As Wagner notes, no officer of reasonable competence could have concluded that it was a "crime" for an 11-year-old child to have violated PL § 130.50.  Violations of this statute would constitute a "designated felony act" as defined in FCA § 301.2(8), but only when a suspect is 13, 14, or 15 years old.  Since plaintiff was 11 years old at the time of the alleged act, it would be unreasonable for an officer to believe that an arrest on this charge was appropriate.

Relatedly, in 2017 (when Wagner was 27 years old), FCA § 302.2 dictated that a juvenile delinquency proceeding for the type of violation at issue here must be commenced before the respondent's twentieth birthday.  In other words, even if defendants had a reasonable basis to believe plaintiff committed the alleged sodomy in 2002, it was clear that they were unable to initiate a prosecution in Family Court for someone over the age of 20.

Taken together, defendants arrested a 27-year-old man based on alleged misconduct dating back to when he was 11 years old, where there was neither an avenue to successfully prosecute an 11-year-old for the crime charged, nor the option to prosecute a 27-year-old in Family Court for such a violation.  The facts and circumstances available to defendants at the time of the arrest were not sufficient to warrant a reasonable officer's belief that Wagner had committed a crime or could be prosecuted.

Defendants assert that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful, and the fact that charges against an arrestee are eventually dropped has no bearing on whether probable cause existed to make an arrest. But both Judge and his supervisor Ogden conceded that the basic question of having jurisdiction is something they resolve prior to arresting a suspect. Specifically, Judge testified that he was trained he should not charge a suspect with a crime if that person could not be prosecuted in a criminal or family court, Judge Dep. at 100:12-22, and Ogden testified that his investigators "do the best [they] can" not to charge an individual in a court that does not have jurisdiction, Ogden Dep. at 27:13-28:9. Recognizing this obligation, Ogden testified that the police did not charge Wagner as an adult in criminal court based on Empie's allegations because "obviously … when the crime occurred, he was a juvenile … [and] the criminal court wouldn't have jurisdiction over [this] conduct …" *Id.* at 25:4-15.

To be sure, an arresting officer may not need to be "certain" that prosecution of an arrestee will be successful. But under the circumstances here, defendants could only have been certain of the exact opposite—that based on their jurisdiction training, the relevant statutes, and the facts uncovered during their investigation, there were clear barriers to prosecuting Wagner.

Defendants also argue that their actions were reasonable because they consulted with Cramer, the County Attorney, prior to arresting Wagner. In support, defendants cite to Ogden's deposition testimony, in which he claims to have discussed the arrest with Cramer. *See* Ogden Dep. at 17:7-18. However, Cramer herself testified that she had no recollection of a conversation with Ogden about plaintiff's case, Cramer Dep. at 12:6-14, and that if there *had* been such a conversation, she would have advised Ogden that she could not commence a prosecution in Family Court against a 27-year-old, *id*. at 24:18-25:9. Additionally, Cramer testified that she does not even advise officers to make arrests. *Id*. at 23:5-14. Finally, Cramer confirmed that a Family Court prosecution against a 13-, 14-, or 15-year-old for a "designated felony" would have to commence before that person turned 20, *id*. at 9:19-10:19; 19:22-20:7, but that an 11-year-old suspect accused of violating PL § 130.50 could not be charged because that individual would be too young, *id*. at 20:17-21:1.

Notably, just a few weeks after Wagner's arrest, Cramer sent letters to plaintiff's attorney, as well as to defendant Hyra, indicating that she was declining to prosecute plaintiff due to a lack of "dispositional options" in Family Court. Dkt. 56-20. While this declination may not be dispositive on the probable cause issue, it certainly supports Cramer's account that, had she

16

discussed plaintiff's case with Ogden, she would have advised them not to make an arrest.

In any event, it is not for the Court to assess the credibility of witnesses. But even assuming Ogden's account is true and viewing the facts in the light most favorable to defendants, an arresting officer's reliance on a prosecutor's advice is just one factor in assessing the existence of probable cause. Indeed, as the First Circuit has noted (and as district courts in this circuit have referenced in passing), "the fact of the consultation [with a prosecutor] and the purport of the advice obtained should be factored into the totality of the circumstances." *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004); *see also*, *e.g.*, *Strawn v. Holohan*, 2008 WL 65586, at *6 (N.D.N.Y. Jan. 4, 2008) (acknowledging that consultation with a prosecutor is "not dispositive" of the existence of probable cause). Moreover, an "'officer's reliance on the prosecutor's advice' must be 'objectively reasonable'—*i.e.*, 'reliance' will not forestall liability 'if an objectively reasonable officer would have cause to believe that the prosecutor's advice was flawed, off point, or otherwise untrustworthy.'" *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 24 (1st Cir. 2016) (citing *Cox*, 391 F.3d at 35).

As explained *supra*, the totality of the circumstances could not warrant an objectively reasonable officer's belief that Wagner committed a crime. Defendants knew plaintiff was 11 years old at the time of the alleged offense,

and that he was therefore too young to have committed the crime of first-degree sodomy.  Defendants also knew that plaintiff was 27 years old at the time of the arrest and was therefore too old to be charged in Family Court for *any* offense.  Standing alone, either of these issues would likely be sufficient to negate probable cause.  Together, they are fatal to the notion that it existed.  Consequently, even if Ogden's claimed conversation with Cramer occurred, it would not affect the outcome of this case under the governing law—"a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one." *Cox*, 391 F.3d at 34; *see also Garcia v. Casey*, 2021 WL 4326900, at *15 (N.D. Ala. Sept. 23, 2021) (granting summary judgment for plaintiff on false arrest claim and concluding that "a reasonable officer would not have had probable cause to arrest based on [the prosecutor's] advice, because that same reasonable officer would have concluded that probable cause did not exist *before* speaking with [the prosecutor]. Even assuming that [the prosecutor] advised … to arrest the Plaintiffs, her advice did not wave a magic wand over [the officer's] probable cause determination, and the court will not do so either").

Accordingly, there are no genuine disputes of material fact as to the existence of probable cause, and there is insufficient evidence for a rational trier of fact to find for defendants on this issue.  In addition, plaintiff has otherwise shown his entitlement to judgment as a matter of law on his false

arrest and false imprisonment claims.  Plaintiff's motion for summary judgment on Counts I and V will be granted, and defendants' motion for summary judgment on these claims, as well as on the malicious prosecution claim (Count III), will be denied.

### B. Failure to Intervene Against Judge (Count IX)

Wagner next asserts that he is entitled to summary judgment on his failure to intervene claim against Judge because defendant had a reasonable opportunity to prevent his arrest and should have known that it amounted to a 4th Amendment violation.  Defendants, for their part, argue that plaintiff cannot establish a failure to intervene claim because he cannot establish an underlying violation of his constitutional rights.

"Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013). To establish a claim for failure to intervene, a plaintiff must prove: (i) that the defendant had a realistic opportunity to intervene and prevent the harm; (ii) a reasonable person in the defendant's position would have known that the plaintiff's constitutional rights were being violated; and (iii) the defendant did not take reasonable steps to intervene. *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988).  Whether an officer had a "realistic opportunity" to intervene is normally a question for the jury, unless,

"considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id*. at 244.

Wagner argues that Judge had sufficient opportunity to intervene to prevent Hyra, his subordinate, from arresting plaintiff. Plaintiff points to Judge's acknowledgment that he played a significant role in the investigation, Judge Dep. at 54:16-24, and that Hyra (who had just been promoted to investigator weeks before and had never arrested an individual for a sexual assault offense) relied on him for experience and insight, *id*. at 54:1-55:4. Plaintiff also highlights several key points in the investigation that involved Judge: (i) Empie's disclosure to both Hyra and Judge that he was allegedly sexually assaulted, *id*. at 44:22-45:23; (ii) Judge's suggestion that Hyra obtain school yearbooks to try and identify the alleged perpetrator, *id*. at 48:19-49:25; (iii) Judge's travel to the site of the alleged incidents while Hyra spoke with witnesses, Dkt. 56-9 at 5; (iv) Judge's interrogation of plaintiff of the date of his arrest, Judge Dep. at 84:9-85:90; (v) Judge's involvement in discussions with Hyra about how best to lure plaintiff to the barracks and how to effectuate his arrest, *id*. at 82:21-84:8; and (vi) Judge's instruction to detain and process plaintiff, *id*. Finally, Wagner notes Judge conceded that he was trained that an officer should not charge a suspect with

a crime if that person could not be prosecuted in a criminal court or family court. *Id*. at 100:12-22.[5]

In response, defendants rely on substantially the same arguments as they did for Wagner's false arrest claim. In short, defendants assert that because plaintiff has failed to make out a false arrest claim, he cannot establish a failure to intervene claim.

For the reasons stated *supra* § IV.A, the Court rejects Judge's arguments. There is insufficient evidence for a rational trier of fact to find that probable cause existed for Wagner's arrest, and plaintiff has shown his entitlement to judgment as a matter of law on his false arrest and false imprisonment claims. Thus, plaintiff has established an underlying violation of his constitutional rights. Further, the undisputed facts demonstrate that Judge had a realistic opportunity to intervene in the arrest, that a reasonable person in Judge's position would have known that the arrest violated plaintiff's constitutional rights, and that Judge did not take reasonable steps to intervene and prevent the arrest. Accordingly, plaintiff's motion for summary judgment on his failure to intervene claim against Judge (Count IX) will be granted, and defendants' motion for summary judgment on this claim will be denied.

---

[5] Plaintiff also claims, for the reasons outlined in support of his false arrest claim, that he has demonstrated there was a constitutional violation as a result of his arrest.

## C. Abuse of Process Against Hyra (Count VII)

Defendants next move for summary judgment seeking dismissal of Wagner's abuse of process claim. The Court finds that there are genuine disputes of material fact with respect to this claim, making summary judgment inappropriate.

To establish an abuse of process claim, a plaintiff must show that defendants: (1) employed regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse of justification; and (3) to obtain a collateral objective that is outside the legitimate ends of the process. *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (citation omitted).

Defendants focus solely on the third element, arguing that Wagner's claim for abuse of process fails because he has not established that Hyra acted to obtain a collateral objective. The collateral objective element requires that a defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution" and therefore "retaliation for some offense will not suffice as a collateral motive for the purposes of an abuse of process claim." *Coleman*, 585 F. App'x at 788. A collateral objective is "usually characterized by personal animus … and may include infliction of economic harm, extortion, blackmail [or] retribution." *Dash v. Montas*, 2020 WL 1550708, at *10 (E.D.N.Y. Mar. 31, 2020) (citations omitted).

Viewing the facts in a light most favorable to Wagner, there is sufficient evidence in the record for a rational trier of fact to find in his favor. Defendants claim the undisputed facts show they had no personal involvement in the placement of plaintiff's arrest on the police blotter, nor could they have because of the way the system is designed.  Defendants cite testimony from Cepiel, the State Police Information Officer, who explained that the online blotter is controlled by software which automatically pulls information from the State Police's system.  Cepiel Dep. at 8:24-9:8.  But, as plaintiff counters, defendants' assertion that Hyra could not play a role in his arrest ending up on the police blotter does not take into account that officers are the ones who enter arrest data into the police computer system, which Cepiel also explained.  *Id.* at 10:3-12:9.  As part of this process, officers must delineate when an arrest involves a juvenile, which Hyra claims he did.  *Id.*; Hyra Dep. at 111:4-15.

The day after Wagner's arrest, Cepiel learned that it ended up on the police blotter despite the juvenile designation.  Cepiel Dep. at 13:12-14:12. Because the blotter posted plaintiff's arrest, news outlets then learned about it.  *Id.* at 13:15-16.  Defendants claim Cepiel stated that Wagner's arrest was only published on the blotter due to a software error that did not correctly recognize that the arrest was a juvenile arrest.  Cepiel did state he was trained that if an officer indicates "arrest-juvenile," when entering arrest

information, the police blotter will not extract and publish that information. Cepiel Dep. at 12:10-18. However, as to how Wagner's arrest ended up on the blotter, Cepiel actually stated in his deposition that he "[did not] have any explanation" for how plaintiff's arrest made it onto the police blotter. *Id*. at 17:12. That Cepiel then offered a guess as to the reason, *id*. at 17:12-17, has no bearing on what actually occurred.[6]

Finally, Rose, the dispatcher involved in the car keying incident with Wagner's girlfriend, testified that Hyra brought plaintiff's arrest to his attention the night that it occurred and told him it involved allegations of sexual assault. Dkt. 56-8 (Rose Dep.) at 36:10-37:5; 41:2-19. According to Rose, Hyra had also discussed gaining retribution against plaintiff prior to his arrest. *Id*. at 38:7-23. That Hyra immediately advised Rose, who he believed to have been victimized by plaintiff after the car keying incident, suggests that Hyra intended to harm plaintiff in a manner outside of the arrest process—particularly because this conversation likely violated FCA § 381.3, which requires that juvenile arrest information be kept confidential.

While the record is far from clear when it comes to how or why plaintiff's juvenile arrest information ended up on the police blotter, these ambiguities

---

[6] This is particularly notable because Cepiel also acknowledged that there were prior incidents where officers erroneously entered information into the computer system, it would be "pushed in" to the blotter, and he would later have to ensure the errors were stripped from the blotter. Cepiel Dep. at 15:5-14.

must be resolved in favor of plaintiff, the nonmoving party.  A rational factfinder could conclude that Hyra had personal involvement in the placement of Wagner's arrest on the police blotter, that he acted to obtain collateral objectives outside the legitimate ends of the legal process, and that he was driven in these actions by personal animus towards plaintiff. Although defendants assert that the arrest information ended up on the blotter because of a computer error, their only evidence is Cepiel's guess that this could have happened.  Given that Rose testified as to Hyra's dislike of plaintiff following the car keying incident, and that Hyra immediately advised Rose of plaintiff's arrest, a factfinder could believe that Hyra sought to use the legal process to obtain illegitimate collateral objectives—namely, plaintiff's loss of employment, and law enforcement, news organizations, and Rose learning about plaintiff's confidential arrest information.

Accordingly, there are genuine disputes of material fact as to the collateral objective element and defendants' motion for summary judgment on Wagner's abuse of process claim (Count VII) will be denied.

### D. Right to Privacy Against Hyra and Judge (Count VI)

Defendants first move for summary judgment on Wagner's right to privacy claim for much of the same reasons that they seek dismissal of his abuse of process claim, namely that the temporary publication of plaintiff's arrest on the blotter was the result of a computer error, not an intentional human

input.  As discussed *supra* § IV.C, there is sufficient evidence in the record for a rational factfinder to find in plaintiff's favor on this point, and the Court rejects this argument.

However, defendants also argue that there is no clearly recognized right to privacy in juvenile arrest records, and plaintiff's privacy claim should be dismissed on the basis of qualified immunity.  This argument is more persuasive.

"Government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (citation omitted).  The two-prong test for determining whether defendants are entitled to qualified immunity asks: (1) whether the facts alleged make out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).[7]

To determine whether a right was "clearly established" for the purposes of qualified immunity, courts in the Second Circuit consider three questions:

---

[7] The Court has discretion to address these prongs in either order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

(1) whether the right at issue was defined with reasonable specificity; (2) whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and (3) whether, under preexisting law, a defendant official would have reasonably understood that his actions were unlawful." *Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999).

"[T]he question of whether a federal constitutional right to privacy has been violated is a distinct question from whether a federal statutory right to privacy … or a state common law right to privacy has been violated." *Scheetz v. Morning Call, Inc.*, 946 F.2d 202, 206 (3d Cir. 1991).  Along these lines, although "the Supreme Court has recognized the states' authority 'to provide and to improve provision for the confidentiality of records of police contact and court action relating to juveniles,' it has treated the issue as a matter on which the states have discretion rather than a constitutional requirement." *O'Neill v. Kerrigan*, 2013 U.S. Dist. LEXIS 24658,  at *33 (E.D. Pa. Feb. 22, 2013) (quoting *In re Gault*, 387 U.S. 1, 25 (1967)); *see also Tucker v. Decker*, 2014 U.S. Dist. LEXIS 176757, at *17 (D. Vt. Dec. 17, 2014) ("courts have found statutes expressly prohibiting the release of juvenile criminal records do not confer constitutional privacy rights on individuals").

Indeed, "most of the federal courts that have considered the issue have found considerable doubt as to whether the constitutional right to privacy extends to juvenile arrest and related records." *O'Neill*, 2013 U.S. Dist.

27

LEXIS 24658, at *34.  As a district court in this circuit has observed, "whether or not [a constitutional right to privacy for juvenile records] exists, it cannot be said to be clearly established by existing case law in this or other circuits." *Doe v. Town of Madison*, 2010 U.S. Dist. LEXIS 99743, at *14 (D. Conn. Sept. 22, 2010).  "Neither the Supreme Court, nor the Second Circuit, has recognized such a right." *Id.*  Moreover, courts of appeal in other circuits have declined to hold that the Constitution protects the confidentiality of juvenile records. *See id.* at 15 (collecting cases).  Finally, courts within this circuit have disagreed as to whether there is a constitutional right to privacy in the confidentiality of a state protected youthful offender file. *See id.* at 15-16 (noting disagreement and contrasting *Soucie v. County of Monroe*, 736 F. Supp. 33, 35 (W.D.N.Y. 1990) with *McCrary v. Jetter*, 665 F. Supp. 182, 186 (E.D.N.Y. 1987)).

In sum, a constitutional right to privacy in juvenile arrest records has not been "defined with reasonable specificity."  The Supreme Court and Second Circuit caselaw does not support the existence of such a right, and, under preexisting law, a defendant official would not have reasonably understood that his actions were unlawful.  Accordingly, at the time of the misconduct alleged in this case, such a right was not clearly established, and defendants are entitled to qualified immunity with respect to Wagner's right to privacy claim (Count VI).

## V. **CONCLUSION**

Therefore, it is

ORDERED that

1.     Plaintiff's motion for summary judgment on Counts I (False Arrest), V (False Imprisonment), and IX (Failure to Intervene) is GRANTED;

2.     Defendants' motion for summary judgment on Counts I, V, and IX, as well as Counts III (malicious prosecution) and VII (abuse of process) is DENIED;

3.     Defendants' motion for summary judgment on Count VI (Right to Privacy) is GRANTED and that claim is DISMISSED;

4.     A jury trial as to liability on plaintiff's two remaining claims (Counts III and VII), as well as damages on Counts I, V, and IX, is set for July 10, 2023 at 10:00 a.m. in Utica, New York.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: March 16, 2023
    Utica, New York.